**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| REBECCA LESTER,<br>*Plaintiff*,<br><br>v.<br><br>ADELBROOK, INC.,<br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>) | 3:24-CV-01796 (SVN)<br><br><br><br><br><br>September 30, 2026 |

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTION TO SUPPLEMENT RECORD**

Sarala V. Nagala, United States District Judge.

In this removed employment action, Plaintiff Rebecca Lester ("Plaintiff") alleges that Defendant Adelbrook, Inc. ("Defendant") violated Plaintiff's rights under the federal Family Medical Leave Act ("FMLA") and Connecticut Family and Medical Leave Act ("CTFMLA") by interfering with her right to take leave and retaliating against her for taking it. The complaint consists of four claims: interference in violation of CTFMLA and FMLA, respectively (Counts One and Three), and retaliation in violation of CTFMLA and FMLA, respectively (Counts Two and Four).

Defendant seeks summary judgment on Plaintiff's claims, asserting that Plaintiff has failed to raise any genuine issues of material fact as to whether it retaliated against Plaintiff or interfered with her right to take leave. Mot. for Summ. J., ECF No. 34. Plaintiff objects, asserting that genuine issues of fact preclude summary judgment. Obj. to Mot. for Summ. J., ECF No. 36. After the close of summary judgment briefing, Plaintiff filed a motion seeking the Court's leave to supplement the record with an affidavit from one of Defendant's former employees. Mot. to Supp., ECF No. 42. Defendant objects. Obj. to Mot. to Supp., ECF No. 44.

For the reasons described below, Defendant's motion for summary judgment is GRANTED with respect to Plaintiff's claims for CTFMLA and FMLA interference, and DENIED with respect to her claims for CTFMLA and FMLA retaliation. Plaintiff's motion to supplement the record is GRANTED.

## I. FACTUAL BACKGROUND

Unless otherwise noted, the parties agree on the following facts. Where facts are undisputed, the Court cites to Plaintiff's Local Rule 56(a)2 Statement.[1]

### A. Plaintiff's Employment History with Defendant

Defendant is a nonprofit multi-service agency specializing in behavioral and developmental services. Pl.'s L.R. 56(a)2 St., ECF No. 36-2 ¶ 1. Alyssa Goduti is President and CEO of Defendant. *See id.* ¶ 2.

Defendant hired Plaintiff on August 15, 2016, as a Payroll Assistant. *Id.* ¶ 3. In approximately late 2019 or early 2020, Plaintiff became an Accounts Payable Specialist responsible for paying invoices on behalf of Defendant. *Id.* ¶ 4. At all relevant times, Plaintiff was supervised directly by Defendant's Finance Director, Ulyana Milhomme, but also reported to Defendant's Chief Financial Officer, Susan Brosseau. *Id.* ¶ 5.

In 2022, Plaintiff took FMLA leave to care for her mother. *Id.* ¶ 6. Defendant granted all the leave Plaintiff required in 2022. *Id.* ¶ 7. Following Plaintiff's return from leave, she was restored to the same position. *Id.* ¶ 8. No employee of Defendant said anything negative to

[1] The Court does not include assertions in Plaintiff's Local Rule 56(a)2 statement that are not properly supported by citations to affidavits or other evidence that would be admissible at trial. *See* D. Conn. L. Civ. R. 56(a)3 ("Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial.").

Plaintiff about her need for FMLA leave in 2022, and there is no allegation that Defendant retaliated against Plaintiff or engaged in interference in connection with her 2022 leave. *Id.* ¶ 9.

After her 2022 FMLA leave, Plaintiff was promoted to Accounts Payable Manager. *Id.* ¶ 10. As the Accounts Payable Manager, Plaintiff was responsible for working with the development manager to maintain restricted funds, determining invoice approvals, processing invoices, resolving invoice discrepancies, reconciling bank statements, following up with vendors, filing 1099s at the end of the year, and preparing checks for electronic payments. *Id.* ¶ 13. This promotion came with a small salary increase. *Id.* ¶ 11.

In June 2024, Plaintiff took FMLA leave for a second time to care for her mother, who had just suffered a severe and unexpected injury. *Id.* ¶ 24; Pl.'s Add'l Mat. Facts, ECF No. 36-2 ¶ 35.[2] Plaintiff was on continuous leave from June 25, 2024, through September 6, 2024. Pl.'s L.R. 56(a)2 St., ECF No. 36-2 ¶ 25. Plaintiff admits that Adelbrook encouraged her to take leave to take care of her mother, even though Plaintiff offered to work from home if necessary. *Id.* ¶ 26.

Plaintiff left a stack of invoices on her desk when she went on leave, which she asserts had just been received from other Adelbrook locations. Pl.'s Add'l Mat. Facts, ECF No. 36-2 ¶ 41; Milhomme Aff., ECF No. 36-3 ¶ 21. Plaintiff did not have time to process these invoices before she left. Pl.'s Add'l Mat. Facts, ECF No. 36-2 ¶ 42; ECF No. 36-3 ¶ 21.

The record does not indicate that Plaintiff ever received any negative performance reviews, warnings, or discipline during her tenure with Defendant. Pl.'s Add'l Mat. Facts, ECF No. 36-2 ¶ 8.

[2] The parties appear to agree that this leave was taken pursuant to federal FMLA and CTFMLA. *See* Compl., ECF No. 1 ¶ 7; ECF No. 34-1 at 9–19 (addressing CTFMLA claims along with FMLA claims and indicating Plaintiff asserted she exercised rights protected by the CTFMLA).

B. Defendant's Invoice Receipt and Payment Process

The parties dispute the manner in which Defendant received invoices from its vendors. In general, payable invoices were mailed or emailed to Defendant. Pl.'s L.R. 56(a)2 St., ECF No. 36-2 ¶ 16. Defendant asserts that invoices were received in one of three ways: "emailed to Plaintiff directly, emailed to an apinvoices@adelbrook.org email address that Plaintiff monitored, or mailed" to Defendant. *Id.* Plaintiff asserts that, while some invoices were emailed to apinvoices@adelbrook.org, Defendant also received invoices via mail at multiple physical addresses. Pl.'s Add'l Mat. Facts, ECF No. 36-2 ¶¶ 13–15, 17; ECF No. 36-3 ¶ 12; *see also*, *e.g.*, Def's. Ex. F, ECF No. 34-2 at 72 (Milhomme's email signature providing an address of "58 Missionary Rd., Cromwell," and Alyssa Goduti's email signature providing an address of "60 Hicksville Rd., Cromwell"); Lester Dep., ECF No. 36-5 at 8 (indicating that the Finance Department moved from "Corporate Row" to "58 Missionary," but invoices were still being mailed to an address at "60 Hicksville"). Additionally, according to Plaintiff, some vendors sent invoices via online portals or directly to other departments, who would then have to forward correspondence to the Finance Department. Pl.'s Add'l Mat. Facts, ECF No. 36-2 ¶¶ 16, 18–19.

The parties agree that, when processing invoices, Plaintiff first entered the invoice into an approval software, and then assigned the invoice to an approval group. Pl.'s L.R. 56(a)2 St., ECF No. 36-2 ¶ 15. All employees in the approval group had to approve the invoice before Plaintiff could then send it to have the invoice actually paid. *Id.* The date next to Plaintiff's name at the bottom of each invoice shows the date that Plaintiff entered the invoice into the system. *Id.* The parties further agree that Plaintiff's supervisors directed her to "use checklists and create systems to ensure invoices were being paid" in a timely manner, and Plaintiff maintained such a checklist for recurring payments. *Id.* ¶ 20; *see id.* ¶ 22. Brosseau informed Plaintiff that she had to "make sure" to "stay on time with invoices." *Id.* ¶ 23.

Plaintiff asserts that prior to approximately May of 2023, Defendant had utilized two employees to process and pay invoices, but from May of 2023 forward, Plaintiff was the only employee responsible for processing and paying invoices. Pl.'s Add'l Mat. Facts, ECF No. 36-2 ¶ 9. Defendant's Finance Department attempted to hire another person to assist with the position, including bringing in a temporary employee through a temporary agency, but that person left prior to Plaintiff's 2024 leave. *Id.* ¶ 10.

C. Discovery of Untimely Invoice Payments

In 2024, Goduti, Defendant's CEO, became aware of several instances in which invoices were paid late, resulting in fees, interest charges, or threatened relationships with vendors.

In or about February 2024, Goduti was notified that t-shirts could not be ordered for an event Defendant was planning because past bills had not been paid. Pl.'s L.R. 56(a)2 St., ECF No. 36-2 ¶ 17. Defendant asserts that Goduti asked Plaintiff about the unpaid t-shirt bills, to which Plaintiff responded that she had a "huge stack of files" and did not know whether the bills had been paid. *Id.* ¶ 18. Plaintiff disputes this account of her conversation with Goduti and asserts that she informed Goduti "that she had just received the [t-shirt] invoice and was in the process of paying it." *Id.* Plaintiff further asserts that the vendor had mistakenly sent the invoice to the employee who had placed the t-shirt order, rather than to the Finance Department, and that employee did not forward it to Plaintiff in a timely manner. *Id.*

On June 27, 2024, a representative of Dime Oil Company emailed info@adelbrook.org to request a response relating to an invoice that had gone unpaid since March of 2024. Def.'s Ex. H, ECF No. 34-2 at 80–81.

On July 12, 2024, a representative from Therap Services, which provides electronic record and documentation software for individuals in residential facilities like Defendant's, sent a Soft Disconnection Notice advising Defendant that it would suspend Defendant's ability to use the

Therap Services LLC Application if it failed to promptly pay an outstanding balance of $12,378.04. Pl.'s L.R. 56(a)2 St., ECF No. 36-2 ¶¶ 27–28. Plaintiff admits she received this invoice prior to her leave, but contends she had been specifically instructed not to pay the invoice. *Id.* ¶ 29; *see also* Def.'s Ex. E, ECF No. 34-2 at 54–55 (correspondence between Therap Services and Ryan Wells, Defendant's employee, requesting a W9 form from Therap before the invoice could be paid).[3]

On July 23, 2024, one of Defendant's vendors, UKG, emailed certain of Defendant's employees regarding $117,984.15 in unpaid invoices dating between March and June of 2024. Def.'s Ex. H, ECF No. 34-2 at 83–84.

On July 25, 2024, Goduti became aware that Defendant owed the Town of Cromwell $11,652.00, and had incurred $699.15 in interest on unpaid sewer bills from 2023. Pl.'s L.R. 56(a)2 St., ECF No. 36-2 ¶¶ 30–31. Goduti testified that late fees were problematic, because that money could be spent "for our kids." *Id.* ¶ 34. Plaintiff's role included paying sewer bills. *Id.* ¶¶ 33, 35.

On August 5, 2024, Goduti became aware that Defendant had an outstanding unemployment invoice with $3,040.52 in penalties and $1,300.16 in late fees. *Id.* ¶ 38. Plaintiff's role included paying unemployment invoices on a quarterly basis. *Id.* ¶ 39.[4]

[3] Defendant contends that Exhibit E does not support Plaintiff's contention that she was instructed not to pay the Therap invoice, but it at least suggests that some additional information was required from Therap before the invoice could be paid.

[4] Defendant suggests that Plaintiff was instructed to include paying unemployment invoices on her checklist so anyone covering for her could take over the responsibility if necessary, but Plaintiff disputes that unemployment invoices were supposed to be part of her checklist. *Id.* ¶ 40. Plaintiff further asserts that she was dependent on Defendant's human resources department to provide her with the information required to pay the unemployment invoices, but does not assert any specific delay attributable to that (or any other) department. Pl.'s Add'l Mat. Facts, ECF No. 36-2 ¶¶ 31–33.

On August 26, 2024, Adelbrook received a "Notice of End of Coverage" from its life insurance provider, stating that its group life insurance policy had been cancelled for non-payment of the premium that was due on June 1, 2024. *Id.* ¶ 45.

Goduti asked Brosseau to audit all late-paid invoices so she could determine the extent of the issue and communicate with the Board of Directors about how to cover the costs. *Id.* ¶¶ 41–42. Brosseau attributed the issue to "staff not doing their job." *Id.* ¶ 43.

D. Plaintiff's Termination

On September 9, 2024, Plaintiff returned from her FMLA leave. *Id.* ¶ 48. On the same day, Brosseau met with Plaintiff and told her that she was "being let go" for "unpaid invoices." *Id.* The termination notice stated that Plaintiff was being terminated for "failing to perform essential job functions, imposing financial hardship on [Defendant], compromising [Defendant's] organizational reputation, jeopardizing the health and safety of [Defendant's] employees, and willful misconduct." *Id.* ¶ 49. In her deposition, Goduti testified that "[w]e decided to terminate Ms. Lester's employment because of the extensive late fees that were paid by the agency because I quite frankly lost trust in her ability to do her job efficiently and effectively given the numerous vendors that had reached out and had not received timely payments, and I didn't think she had the capacity to do the work that we needed to get done." *Id.* ¶ 51. Plaintiff contests that these were the true reasons for her termination. *Id.* ¶¶ 48–49, 51.

Goduti made the decision to terminate Plaintiff's employment in consultation with Brosseau and Director of Human Resources, Aimee Plourde. *Id.* ¶ 50. Plaintiff asserts that her direct supervisor, Ulyana Milhomme, was not involved or consulted regarding the decision to terminate Plaintiff, and neither of Plaintiff's supervisors were disciplined for failing to oversee her work. Pl.'s Add'l Mat. Facts, ECF No. 36-2 ¶¶ 49–50.

Plaintiff does not dispute that her replacement "has been able to manage the timely payment of invoices," that another Accounts Payable employee who did not take FMLA leave had been terminated for failing to complete work accurately and on time, or that one of Plaintiff's supervisors had taken FMLA leave and was not terminated. Pl.'s L.R. 56(a)2 St., ECF No. 36-2 ¶¶ 53–55.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial." *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001). "It need only point to an

absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with specific evidence—beyond "conclusory allegations or unsubstantiated speculation"—that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249; *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## III. DISCUSSION

The Court concludes, first, that it is appropriate to grant Plaintiff's motion to supplement the record with new evidence she received after discovery was closed and briefing on the summary judgment motion had concluded. It further concludes that, while Plaintiff's FMLA and CTFMLA retaliation claims survive summary judgment, her interference claims under those statutes do not.

### A. Motion to Supplement the Record

On March 5, 2026, nearly two months after the close of summary judgment briefing, Plaintiff moved to supplement the record on summary judgment with an affidavit from Karen Logue, Defendant's former human resources manager. Mot. to Supp., ECF No. 42. Logue had

not been identified in either party's initial discovery disclosures, although she signed the termination letter Plaintiff received. *See* Def.'s Ex. J, ECF No. 34-2 at 89. Plaintiff represents that Logue contacted Plaintiff's counsel—unprompted—in early March of 2026 and volunteered information about statements Goduti had made in the summer of 2024 when Plaintiff took FMLA leave. ECF No. 42 at 1–2. Plaintiff moved to supplement the summary judgment record a few days later with a sworn affidavit from Logue. *See id.* at 1; Logue Aff., 42-1.

The affidavit states that Logue heard Goduti make "negative comments" about Plaintiff's FMLA leave—specifically, that "this was [Plaintiff's] third time taking FMLA leave and that when [she] took FMLA leave, it was always in the summer." ECF No. 42-1 ¶¶ 2–3. Logue attests that her impression from these "negative" comments was that Goduti was "annoyed and frustrated" by Plaintiff's use of FMLA leave. *Id.* ¶¶ 2, 4. Logue further stated that she became concerned about her own employment, as she anticipated needing to take FMLA leave herself in the future. *Id.* ¶ 5.

Exercising its discretion, the Court will consider Logue's affidavit in resolving the present motion for summary judgment.

Pursuant to Fed. R. Civ. P. 6(b)(1)(B), "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." In applying the "excusable neglect" standard, courts consider four factors: "the danger of prejudice . . . , the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993); *see Canfield v. Van Atta Buick,* 127 F.3d 248, 250 (2d Cir. 1997) ("*Pioneer's* more liberal definition

of excusable neglect is applicable beyond the bankruptcy context where it arose.") (quotation marks and citation omitted). At bottom, the determination is an "equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co.*, 507 U.S. at 395.

The third factor—"the reason for the delay, including whether it was within the reasonable control of the movant"—is the predominant factor in the Court's analysis, and weighs in favor of consideration of the Logue affidavit here. *Id.*; *see Williams v. KFC Nat. Mgmt. Co.*, 391 F.3d 411, 415–16 (2d Cir. 2004) ("it is the third factor—the reason for the delay—that predominates, and the other three are significant only in close cases"). Here, Plaintiff has advanced a sufficient reason for her failure to produce Logue's affidavit during the discovery process. Although Logue was the signatory on Plaintiff's termination letter, *see* Def.'s Ex. J, ECF No. 34-2 at 89, and exchanged some emails with Plaintiff about her termination in her role as Human Resources Manager, Ex. A to Def's Opp to Mot. to Supp. Record, ECF No. 44-1 at 4–5, neither party identified Logue in their initial disclosures as a witness who may have relevant information about Plaintiff's claims. Plaintiff was not aware of the "specific, material information contained in [Ms. Logue's] affidavit—namely, that [Ms. Goduti] expressed frustration with Plaintiff's FMLA usage in a manner probative of retaliatory animus," until Logue came forward to Plaintiff's counsel unexpectedly in March of 2026. ECF No. 45 at 2; ECF No. 42 ¶¶ 2–4. While it is Plaintiff's responsibility to prosecute her claims, and the purpose of discovery is to collect relevant information, the parties agree Logue was not a decisionmaker in Plaintiff's termination and that neither party had reason to know that Logue had a conversation with Goduti about Plaintiff's FMLA leave. ECF No. 44 at 5; ECF No. 45 at 2. The Court does not seek to condone a discovery procedure in which Plaintiff fails to pursue relevant information. But it is convinced that, under

the unique factual circumstances here, Plaintiff has proffered a sufficient reason for her failure to obtain Logue's affidavit during the discovery process.

The remaining three factors also either weigh in favor of considering the Logue affidavit or are neutral. Defendant does not argue that it will suffer significant prejudice from inclusion of the affidavit. While it contends that it would have been "useful" to have been able to cross-examine Logue, the areas of possible cross-examination that Defendant elucidated at oral argument related to clarification of the context for Goduti's alleged statement and the probing of any bias Logue may have against Defendant. *See* Tr., ECF No. 48 at 8–9.[5] Bias, of course, is relevant to credibility—a matter on which the Court can make no determination at summary judgment. *See Proctor v. LeClaire*, 846 F.3d 597, 607–08 (2d Cir. 2017) (citation omitted). And while clarification of the context may indeed have been useful, the Court does not believe that Defendant's inability to cross-examine Logue for this purpose creates a level of prejudice sufficient to overcome the weight of the first factor. Moreover, Logue was Defendant's employee during the relevant events, so she was readily accessible to Defendant during Plaintiff's employment, had it wished to question her about Plaintiff's allegations.

Further, while the affidavit was submitted approximately two months after briefing closed on Defendant's summary judgment motion and three months after Plaintiff's opposition brief was filed, the length of the delay between Plaintiff learning of the information from Logue and her moving to supplement the record was only a few days. Consideration of the affidavit will not impact the progression of the proceedings—especially since Defendant has not requested to reopen discovery to depose Logue. Finally, the Court cannot find that Plaintiff acted with anything but

[5] Logue has sued Defendant for FMLA interference and retaliation in connection with her own termination. *See Logue v. Adlebrook, Inc.*, No. 3:26-CV-666 (SVN).

good faith under these unusual circumstances, where a witness came forward with new information that Plaintiff had not expected to learn.

Because Plaintiff has provided good reason for the delay, the Court finds that her failure to submit it earlier is the result of excusable neglect and exercises its discretion to consider Logue's affidavit in assessing Defendant's motion for summary judgment.[6]

B. Motion for Summary Judgment

For the reasons explained below, the Court holds that there are genuine disputes of material fact concerning whether Defendant retaliated against Plaintiff for taking FMLA/CTFMLA leave (Counts Two and Four, respectively), but that summary judgment is appropriate on Plaintiff's FMLA and CTFMLA interference claims (Counts One and Three, respectively).

*1. The FMLA and CTFMLA*

The FMLA provides "broad protections to employees who need to take time away from work to deal with serious health conditions of the employee or her family." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017). Under the FMLA, an eligible employee is entitled to take up to twelve weeks of leave to care for a parent with a "serious health condition," 29 U.S.C. § 2612(a)(1)(C), and the employee is entitled to reinstatement to her former position or an equivalent position at the end of her leave, *id.* § 2614(a). It is unlawful for any employer to "interfere with" the employee's exercise of her FMLA rights. *Id.* § 2615(a)(1). If an employer retaliates against an employee by terminating her for exercise of her FMLA rights, the employee may bring a clam under § 2615(a)(1). *See Woods*, 864 F.3d at 167.

Similarly, the CTFMLA allows eligible employees to take a total of twelve workweeks of leave during a twelve-month period to care for a family member with a serious health condition.

[6] Should Defendant wish to depose Logue prior to trial, the Court is amenable to reopening discovery for that limited purpose, in the interest of fairness.

Conn. Gen. Stat. § 31-51*ll*(a)(1) & (a)(2)(C). Like with the federal FMLA, it is unlawful for an employer to "interfere with" the employee's exercise of her FMLA rights or to retaliate against an employee who exercises such rights. Conn. Gen. Stat. § 31-51pp(a)(1) & (2).

*2. Retaliation*

Plaintiff's retaliation claims survive summary judgment.

The Court analyzes FMLA retaliation claims under the burden-shifting framework the Supreme Court set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016). The CTFMLA is Connecticut's "state analogue" to the federal FMLA, and it reflects an "explicit statutory directive" to ensure compatibility with the federal FMLA. *Cendant Corp.* v. *Commissioner of Labor*, 276 Conn. 16, 23 (2005). Thus, FMLA jurisprudence "guides" interpretation of CTFMLA. *Id.* Accordingly, the Court applies the *McDonnell Douglas* framework to both the FMLA and CTFMLA claims. *See Mayo v. Foskett Equip., Inc.*, No. WWM-CV22-6023915-S, 2023 WL 4738345, at *3 (Conn. Super. Ct. July 18, 2023) (applying *McDonnell Douglas*).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of retaliation. *Id.*; *see also Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004); *Woolf v. Strada*, 792 F. App'x 143, 145–46 (2d Cir. 2020) (summary order). This burden has been described as "de minimis." *Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 72 (D. Conn. 2014) (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must establish that (1) she "exercised rights protected under the FMLA"; (2) she "was qualified" for her position; (3) she "suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429 (citation omitted).

If the plaintiff establishes a prima facie case, "the defendant must demonstrate a legitimate, non-discriminatory reason for its actions." *Id.* If the defendant does so, "the plaintiff must then show that [the] defendant's proffered explanation is pretextual." *Id.* The plaintiff may satisfy this burden by demonstrating "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason . . . or by providing evidence such that a reasonable factfinder could conclude that the prohibited reason was a motivating factor in the adverse employment action." *Greenberg v. State Univ. Hosp. – Downstate Med. Ctr.*, 838 F. App'x 603, 606 (2d Cir. 2020) (summary order) (internal citations and quotation marks omitted); *see also Woods*, 864 F.3d at 168–69 (rejecting "but for" causation standard for FMLA retaliation claims). The ultimate burden of persuading the trier of fact that the defendant retaliated against the plaintiff always remains with the plaintiff. *See*, *e.g.*, *Szestakow v. Metro. Dist. Comm'n*, No. 3:10-cv-567 (WWE), 2016 WL 4639129, at *4 (D. Conn. Sept. 6, 2016) (recognizing a plaintiff's ultimate burden of proving that retaliation caused the adverse employment action); *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.").

a. *Prima Facie* Case

First, Plaintiff has demonstrated a *prima facie* case that Defendant retaliated against her for taking leave. The parties do not dispute that Plaintiff has satisfied the first three elements of the *prima facie* case: that she exercised rights protected under CTFMLA and FMLA, that she was qualified for her position as Accounts Payable Manager, and that she suffered an adverse

employment action when she was terminated.[7] They do dispute the fourth element—whether the circumstances of Plaintiff's termination give rise to an inference of retaliatory intent.

The temporal proximity between Plaintiff's exercise of her rights and her termination is sufficient to give rise to an inference of retaliation. Defendant is correct that a plaintiff may support her *prima facie* case by pointing to "negative remarks" suggesting animus or identifying similarly situated colleagues who were treated differently from her, and Plaintiff did not do so during the initial briefing on summary judgment. ECF No. 34-1 at 10–12. But a plaintiff is not *required* to point to negative remarks or similarly situated comparators—nor are these the only types of evidence that may support a *prima facie* case. Indeed, it is well-established that temporal proximity between the exercise of rights under the FMLA and the adverse employment action can support an inference of retaliatory animus.

"At the *prima facie* stage, a plaintiff can rely solely on temporal proximity to establish the requisite causal connection between her protected activity and the materially adverse action that she allegedly suffered in retaliation for engaging in that activity." *Wheeler*, 694 F. Supp. 3d at 464–65 (finding that where "less than two months passed between the protected activity and the adverse employment action . . . [the plaintiff] ha[d] adduced enough to establish the fourth and final element of a *prima facie* FMLA retaliation claim.") (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 114 (S.D.N.Y. 2012)); *see also Palma v. Pharmedica Commc'ns, Inc.*, No. 3:00-CV-1128 (AHN), 2002 WL 32093275, at *5 (D. Conn. Mar. 27, 2002) ("The proximity in time between the exercise of Palma's FMLA rights and her termination can likewise lead to an inference of

---

[7] For purposes of the FMLA's anti-retaliation provision, a materially adverse action "is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." *Millea v. Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). "[T]ermination of employment is a quintessentially adverse action." *Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 464 (S.D.N.Y. 2023) (citing *Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020)).

retaliation.”). While there is no “bright-line rule as to how close in time the protected activity need be to the adverse action to give rise to this inference,” courts in the Second Circuit have generally held that periods of three months or less between the protected activity and the adverse action are “close enough to give rise to an inference of a causal connection.” *Wheeler*, 694 F. Supp. at 464–65 (collecting cases). Here, even though Plaintiff took leave without issue in 2022, and even though Defendant’s personnel encouraged Plaintiff to take leave in 2024, *see* ECF No. 36-2 ¶ 26, Plaintiff was terminated on the very day she returned from leave, giving rise to an inference of retaliation. *See Khan v. ELRAC, LLC*, No. 3:23-CV-00003 (KAD), 2024 WL 1344694, at *5 (D. Conn. Mar. 29, 2024) (finding that temporal proximity of less than two weeks between the end of leave and an adverse employment action “supports an inference of retaliatory intent” and is “much less than what has been held sufficient to plead retaliatory intent in other cases in this Circuit”)).

Additionally, Milhomme’s affidavit indicates that Plaintiff “performed her job duties at or above a satisfactory level” for “the entire time” Milhomme supervised Plaintiff, further supporting an inference of retaliation. *See* ECF No. 36-3 ¶ 3; *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 3:04-CV-1707 (PCD), 2006 WL 2642415, at *16 (D. Conn. Sept. 13, 2006) (recognizing cases holding that “a lengthy period of satisfactory performance may raise an inference of discrimination for purposes of establishing a *prima facie* case,” but such performance alone may not be sufficient to demonstrate that an employer’s reasons for termination are pretextual) (citation omitted), *adhered to on reconsideration,* 2006 WL 8446750 (D. Conn. Nov. 6, 2006), *aff’d,* 282 F. App’x 930 (2d Cir. 2008).

Plaintiff has met her *de minimis* burden at this stage. Accordingly, a “‘presumption of retaliation arises,’ and the burden shifts to Defendant to articulate a legitimate, non-retaliatory

reason for the adverse employment action." *Wanamaker*, 11 F. Supp. 3d at 72 (citation omitted); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

b. Legitimate, Non-Retaliatory Reason for Termination

At the second stage, Defendant has proffered a legitimate, non-retaliatory reason for its decision to terminate Plaintiff. At this stage, the burden "is one of production, not persuasion, and it involves no credibility assessment." *Wanamaker*, 11 F. Supp. 3d at 72 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). "Defendant must merely set forth, through admissible evidence, 'reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action.'" *Id.* (emphasis in original) (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 507).

Defendant has proffered a legitimate, non-retaliatory justification: that Plaintiff failed to process and pay invoices in a timely manner, causing Defendant to incur interest and penalties and jeopardizing Defendant's relationships with its vendors. ECF No. 34-1 at 12–13. "Poor performance is a well-established legitimate, non-discriminatory reason for termination." *Kelepecz v. Children's Learning Centers of Fairfield Cnty., Inc.*, No. 3:21-CV-136 (OAW), 2024 WL 1141821, at *9 (D. Conn. Mar. 15, 2024) (citing *Carlton v. Mystic Transp.*, 202 F.3d 129, 136 (2d Cir. 2000). Here, as described above, Defendant has proffered evidence that upper management discovered several instances in which Defendant had incurred penalties or interest, or that vendor relationships had been harmed, in relation to unpaid invoices dated as coming due prior to Plaintiff's leave. *See* Def's. Ex. D, ECF No. 34-2 at 49–50 (notice that Therap Services LLC may suspend Defendant's services agreement because Defendant was in default of its obligations); Def's. Ex. F, ECF No. 34-2 at 69–70 (email chain relating to interest charged by the Town of Cromwell on sewer bill); Def's. Ex. H, ECF No. 34-2 at 80–81 (message indicating that oil company representative had "been trying to contact someone regarding the attached invoice,"

and "no one has called . . . back nor responded to any emails"); *id.* at 82–84 (email chain including a listing of several unpaid invoices from human resources information systems provider); Def's. Ex. I, ECF No. 34-2 at 86 (cancellation notice from life insurance provider, citing unpaid premiums). Defendant has likewise proffered evidence that payment of invoices was Plaintiff's responsibility. *See*, *e.g.*, Def's. Ex. A, ECF No. 34-2 at 4–5; Def's. Ex. G, ECF No. 34-2 at 77. Finally, Defendant has offered the testimony of Goduti to indicate that decisionmakers believed Plaintiff was at fault for the fines, penalties, and jeopardized service contracts, and that such failures were sufficiently problematic to constitute grounds for termination. *See* Def's. Ex. B, ECF No. 34-2 at 40–41. Accordingly, Defendant has satisfied its burden of production at the second step.

c. Pretext

At the third step, the burden shifts back to Plaintiff, who must establish by a preponderance of the evidence that Defendant's stated reason is pretextual. *Serby v. New York City Dept. of Educ.,* 526 Fed. App'x. 132, 134 (2d Cir. 2013); *Wanamaker,* 11 F. Supp. 3d at 72. "'A plaintiff may prove . . . retaliation . . . by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.'" *Graziadio*, 817 F.3d at 430 (quoting *Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 846 (2d Cir. 2013)).

Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendant's explanation for Plaintiff's termination is pretextual. Plaintiff has advanced evidence that her performance was satisfactory, and has pointed to weaknesses in Defendant's proffered reason that she was terminated for poor performance.

First, the record supports an inference that Plaintiff was generally a satisfactory employee. Plaintiff's immediate supervisor, Ulyana Milhomme, submitted an affidavit stating that, for "the entire time" she supervised Plaintiff, she "considered her a good employee and believe[d] that she performed her job duties at or above a satisfactory level." ECF No. 36-3 ¶ 3 . Additionally, there is no indication that Plaintiff ever received any negative feedback prior to her termination. Plaintiff reported that Brosseau did not provide performance reviews during her tenure as Accounts Payable Manager, and that, while Brosseau spoke to Plaintiff about paying invoices in a timely manner, such conversations were never framed as negative feedback. *See* ECF No. 36-5 at 12, 15–16. Several courts in this Circuit have found evidence of pretext where the employee had never received a poor performance evaluation. *See Carlton*, 202 F.3d at 137 (reasoning that the plaintiff "never received a negative written performance evaluation or formal warning, nor is there any writing whatsoever criticizing his job performance, indicating that as a reason for his firing poor job performance was an afterthought"); *Almodovar v. Cross Fin. Corp.*, No. 3:20-CV-1179 (JCH), 2022 WL 1810132, at *12 (D. Conn. June 2, 2022) (fact that the plaintiff "was not even told that she was not performing adequately until the day she was terminated" could contribute to a finding that the proffered reasons for termination were pretextual); *Rodrigues v. Conn. Container Corp.*, No. 3:20-CV-294 (JCH), 2022 WL 844610, at *7 (D. Conn. Mar. 22, 2022) ("It is undisputed that [the plaintiff] never received a poor performance review over the course of his near-thirty-year employment.").

In an email on August 5, 2024, Goduti requested that Brosseau provide "copies of the checklists and any comments/supervision notes for her files that show that [Plaintiff] reported being on top of AP or any notes in which [Brosseau] had to provide feedback when [Plaintiff had] fallen behind. If [Plaintiff] reported that she filed the unemployment in a checklist, do we have

that in writing? This will be important to have in [Plaintiff's] file . . . We need to take action on this quickly from an HR perspective." Def.'s Ex. G, ECF No. 34-2 at 76. Despite this request, the record on summary judgment does not contain any such checklists, comments, supervision notes, or feedback showing Plaintiff fell behind. Nor does it contain evidence that Plaintiff was ever told her performance was deficient.[8] Based on the evidence before the Court, a reasonable juror might conclude that there simply was no "paper trail" supporting Plaintiff's termination for poor performance, and she was terminated anyway. *See D'Alessandro v. Arrow Pharmacy Holdings, LLC*, No. 3:20-CV-536 (SVN), 2023 WL 1967245, at *9–10 (D. Conn. Feb. 13, 2023) ("[B]ecause the record contains no other evidence that Plaintiff was told his performance was generally deficient, a reasonable jury could find that Defendants' stated reason for terminating Plaintiff for generally poor performance was pretextual."); *Rodrigues*, 2022 WL 844610, at *7.

Second, based on the record before the Court, it is not clear that Plaintiff was actually responsible for the nonpayment of many overdue invoices that were discovered during her leave, such that a jury may not give credence to Defendant's proffered reason that she was terminated for failing to pay invoices. "The reasonableness of the employer's reasons for discharge is, of course, probative of the question whether they are pretexts." *Meiri v. Dacon*, 759 F.2d 989, 997 n.13 (2d Cir. 1985) (citation and quotation marks omitted); *see also Graziado*, 817 F.3d 415 at 430 (Plaintiff "may be able to show that it would have been unreasonable for defendants to believe she had" failed in her job duties "and, thus, that such a belief could not have motivated her termination").

Plaintiff has proffered evidence suggesting that the entirety of Defendant's Finance Department was struggling with receiving and keeping track of invoices, such that Defendant's

---

[8] Brosseau stated that Plaintiff was "told many times to operate under a checklist," and the record suggests that Plaintiff did, in fact, use a checklist. *See* ECF No. 34-2 at 11, 76.

failure to make timely invoice payments may not necessarily have been attributable to Plaintiff alone. Milhomme, Plaintiff's supervisor, reports that "[r]eceiving invoices promptly was an ongoing challenge for the Finance Department," and "invoices [were] regularly . . . sent to [Defendant's] residential facilities, other departments," or Defendant's former physical office, such that the department "would sometimes not receive these invoices at all, or if it did so, it would receive them late." ECF No. 36-3 ¶ 14 ; *see also* ECF No. 36-5 at 9–11 (explaining that the Finance Department was not regularly receiving mail, and that mail was often delivered to one of two incorrect addresses). Milhomme avers that the Finance Department was aware of these delays in receiving invoices and "were working to resolve it," though "there was not an easy, straightforward solution," and that the Department intended to "continue to refine the process for receiving and paying invoices when [Plaintiff] returned" from leave in 2024. ECF No. 36-3 ¶¶ 16, 22. Goduti herself indicated to Brosseau that she had "serious concern[s]" with the way the Finance Department was functioning. Goduti Dep., ECF No. 36-6 at 7. And Brousseau acknowledged that if she herself had '"missed that . . . invoices were unpaid this spring[,] we can conclude that [the method of supervision in the Finance Department] is ineffective.'" ECF No. 34-2 at 75.

A jury may find the Finance Department's struggles relevant to Plaintiff's termination because the record does not indicate that all of the overdue bills that were supposed to be delivered to Defendant's office were actually delivered to the Finance Department in a timely fashion. For example, the record demonstrates that bills from at least one of Defendant's vendors had become overdue before even being received by the Finance Department. *See* ECF No. 34-2 at 52–56 (email chain regarding an "overdue invoice" from Therap Services, stating "we have not received this invoice in Finance"). A sewer bill from the town of Cromwell, in relation to which Defendant was charged $699.15 in interest, does not indicate where or through what method the bill was sent, and

left the "care of" and "address" fields blank. *See* Def's. Ex. F, ECF No. 34-2 at 66.[9] Goduti testified in her deposition that she was unaware of how sewer bills are sent to or received by Defendant, *see* ECF No. 36-6 at 3, and Milhomme indicated that sewer bills, in particular, were often sent to residential facilities rather than directly to the Finance Department, *see* ECF No. 36-3 ¶¶ 12–13. Similarly, the record before the Court does not indicate where the information systems provider's invoices were sent, and Goduti was likewise unaware of how such bills were sent to Defendant. ECF No. 36-6 at 11. A communication from Defendant's oil company regarding an overdue bill was sent to info@adelbrook.com, rather than the Finance Department's accounts payable email inbox, and the original bill was addressed to "60 Hicksville Road, Attn: Jeffrey Swanson." ECF No. 34-2 at 80–81. Finally, Plaintiff avers that an invoice from a T-shirt vendor had become overdue before Plaintiff ever received the invoice, which had been erroneously sent to a different employee of Defendant, working in a different department.

The record also indicates that the process for paying invoices involved several employees, not just Plaintiff, further suggesting that the unpaid invoice problem may not have been fully attributable to Plaintiff. From May 2023 forward, Plaintiff was "the only employee responsible for processing and paying invoices." ECF No. 36-3 ¶ 6. However, as Defendant acknowledges, Plaintiff "was not the only person handling the payment of invoices," because she "had assistance from a temporary employee who left only one week before Plaintiff went out on leave." Def.'s Reply Br., ECF No. 41 at 5–6; *see also* ECF No. 36-5 at 31; ECF No. 36-3 ¶ 7 (indicating that a temporary employee hired to assist Plaintiff had recently left). Neither party has advanced evidence describing the temporary employee's job duties or whether they were performed in a satisfactory manner. Additionally, Plaintiff maintains that other employees were responsible for

[9] The address "60 Hicksville Road" appears in a different field on the bill, however. *Id.*

sharing information necessary to process and pay certain bills, including life insurance and unemployment. ECF No. 36-5 at 13–14 (testifying that the Finance Department did not receive bills directly from the insurance company for life insurance; rather, another employee was responsible for informing her about such bills); *id.* at 15 (testifying that Plaintiff would "reach out to Karen [Logue]" on a monthly basis for the unemployment bill). Still other invoices required approvals from other departments before Plaintiff could pay them, creating further opportunities for delays. *See* L.R. 56(a)2 St*.,* ECF No. 36-2 ¶ 15; ECF No. 36-3 ¶ 15.

Finally, Plaintiff was terminated almost immediately upon her return from leave, suggesting Defendant's rationale may be pretextual. To be sure, "[t]emporal proximity alone is not enough to establish pretext in this Circuit." *Abrams v. Dept of Public Safety*, 764 F.3d 244, 254 (2d Cir. 2014). And Defendant is correct that district courts in this Circuit have found no pretext despite temporal proximity "'where the legitimate, non-discriminatory justification for an employee's termination is discovered as a result of the employee's leave.'" ECF No. 41 at 7 (quoting *Lehtinen v. Town of Greenport*, No. 1:12-CV-393 MAD/CFH, 2014 WL 3477037, at *11 (N.D.N.Y. July 11, 2014)). But "'temporal proximity, together with other evidence such as inconsistent employer explanations,' may be enough" to show pretext and defeat summary judgment. *See Uttarwar v. Lazard Asset Mgmt. LLC*, No. 24-1085-CV, 2025 WL 704278, at *4 (2d Cir. Mar. 5, 2025) (quoting *Zann Kwan*, 737 F.3d at 847); *see*, *e.g.*, *Darboe v. Staples, Inc.*, 243 F. Supp. 2d 5, 18 (S.D.N.Y. 2003) (finding that a "strong temporal correlation" between the exercise of FMLA rights and the adverse employment action, in conjunction with other factors, can provide grounds for denial of summary judgment). Here, when considered in conjunction with the evidence described above, the temporal proximity of being terminated on the very same

day she returned from leave raises a genuine issue of material fact with respect to whether Plaintiff was terminated in retaliation for exercising her FMLA and CTFMLA rights.[10]

In sum, the Court finds that Plaintiff has offered evidence and pointed to weaknesses in Defendant's proffered rationale that may cause a reasonable juror to disbelieve that Plaintiff was terminated for poor performance and instead took the fall for department-wide issues because she had exercised her right to take leave under CTFMLA and FMLA. The credibility of Defendant's explanation is particularly ripe for resolution by a jury because it depends, in part, on disputed facts surrounding Defendant's process for receiving and paying invoices.

In considering whether Plaintiff has demonstrated pretext, the Court's role is not to determine whether Defendant made a sound business decision in deciding to terminate Plaintiff, or whether Plaintiff *should* have been terminated in relation to the unpaid invoices. On summary judgment, "a court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Darboe*, 243 F. Supp. 2d at 18 (citing *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987)). To be sure, a reasonable jury could conclude that Defendant's stated dissatisfaction with Plaintiff's performance was not pretextual, given that Plaintiff was the employee responsible for paying invoices, management discovered many overdue invoices while Plaintiff was out on leave, Plaintiff's replacement has been more successful in the role, an employee who did not take FMLA leave was terminated for not timely and accurately completing her work, and other employees who took FMLA leave were restored to their positions. *See* ECF No. 34-1 at 11–12, 14–16. Indeed, Plaintiff herself submits that her role was "too big for one person" and suggests she was not always able to keep up with its demands. *See* ECF No. 36-3 ¶ 7; *see also* ECF No. 34-3 at 75 (suggesting Plaintiff was "not doing [her] job"). But, viewing the

[10] Logue's affidavit detailing Goduti's comments about Plaintiff's FMLA leave always being in the summer, *see* ECF No. 42-1 ¶¶ 2–4, also contributes to the existence of a jury question about whether Plaintiff was retaliated against.

evidence in the light most favorable to Plaintiff, Plaintiff's history of positive performance, the temporal proximity between her return from leave and her termination, and the weaknesses in Defendant's stated rationale for Plaintiff's termination add up to a triable issue of fact on the question of pretext.

Thus, the Court denies Defendant's motion for summary judgment as to Counts Two and Four of the complaint, alleging retaliation in violation of the FTMLA and CTFMLA.

*3. Interference*

Plaintiff's interference claims do not survive summary judgment, however. "To prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio*, 817 F.3d at 424. As before, the Court analyzes Plaintiff's CTFMLA and FMLA interference claims under the same standard. *See Carter v. MetLife Grp., Inc.*, No. 3:23-CV-00684 (SVN), 2023 WL 8476211, at *5 n.4 (D. Conn. Dec. 7, 2023) (acknowledging that FMLA and CTFMLA are "analogous").[11]

Plaintiff's theory of interference is that Defendant "effectively blamed" Plaintiff for not processing invoices and issuing payments while she was out on leave, such that Defendant "expected her to have worked while out on leave" and thus interfered with her ability to take leave. *See* ECF No. 36-1 at 12. Regardless of whether or not Plaintiff was responsible for the delay in processing invoices dated prior to the beginning of her leave, Plaintiff has not produced any

[11] At least one district court in the Circuit has concluded that the burden-shifting framework from *McDonnell Douglas* also applies to cases alleging a theory of FMLA interference by termination. *See Sparks v. The New York Times Co.*, No. 1:24-CV-45 (JLR), 2026 WL 2389222, at *13–15 (S.D.N.Y. Aug. 17, 2026). As the interference claim fails for other reasons, the Court does not address this question, which was not briefed by the parties.

evidence suggesting that she was expected to work while on leave. Indeed, the emails produced by Defendant indicate that Plaintiff's colleagues were aware she was out on leave and chose to handle overdue invoices without her assistance. *See* ECF No. 34-2 at 69 (email from Milhomme stating "with [Plaintiff] being out I don't want to make assumptions. I will look into it and see why this was not paid."); *id.* (email from Milhomme stating she and another employee were working on handling past due bills while Plaintiff was out). There is no suggestion that Plaintiff was contacted and asked to work, that she was "on call," or even that any of Defendant's employees subjectively expected her to resolve the overdue invoices during her leave. *Cf.* ECF No. 36-1 at 12 (citing *Sherman v. AI/FOCS, Inc.*, 113 F. Supp. 2d 65, 70 (D. Mass. 2000) ("The ability to take FMLA leave is not conditioned upon the willingness of an employee to remain 'on call' to the employer")). Accordingly, even if Plaintiff had pointed to any in-Circuit authority stating that expecting an employee to work while on leave constitutes interference, she would not have been able to show that Defendant interfered with her leave in this manner.

The only alternative basis Plaintiff has articulated for her interference claim is that, by terminating her, Defendant denied her the right to be restored to her position when she returned from leave. This, too, is insufficient to preclude summary judgment on Plaintiff's interference claim.

FMLA interference claims and FMLA retaliation claims "serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA." *Woods*, 864 F.3d at 166. "An interference claim arises when an employer interferes *ex ante* with an employee's exercise of her FMLA rights," whereas a retaliation claim arises only after the employee has already exercised her FMLA rights and faces an adverse employment action. *Blake v. Recovery Network of Programs, Inc.*, 655 F. Supp. 3d 39, 45 (D. Conn. 2023); *see Nzugang v.*

*Hutchinson Precision Sealing Sys., Inc.*, No. 3:21-CV-01567 (VAB), 2023 WL 4551377, at *5, *14 (D. Conn. July 14, 2023). Consistent with this view, district courts in this Circuit have recognized "interference-by-termination" claims "where a plaintiff was terminated before taking anticipated leave" or had demonstrated an intent to take FMLA leave. *See Sanders v. Zurich Am. Ins. Co.*, 818 F. Supp. 3d 309, 322 (D. Conn. 2026) (collecting cases). On the flip side, district courts have rejected FMLA interference claims where the employee had not requested leave and did not have a sufficiently concrete plan to seek protected leave. *See id.* (collecting cases); *Nzugang*, 2023 WL 4551377 at *14. Here, Plaintiff does not allege any *ex ante* conduct on the part of Defendant that impacted her rights under the FMLA. *See Khan*, 2024 WL 1344694, at *5 (finding the same) (citing *Woods,* 864 F. 3d at 166). Defendant did not prevent Plaintiff from taking leave or discourage her from doing so. *See* Def.'s Ex. A, ECF No. 34-2 at 12 ("I told [Brosseau] that if she needed me to work from home, I could work from home, and she told me no. She said 'Just take care of your mom. Focus on your mom.'").

To be sure, "retaliation for the exercise of FMLA rights is itself an actionable form of interference under § 2615(a)(1)." *Khan*, 2024 WL 1344694, at *5. But here, as in *Khan*, Plaintiff's interference claim derives from her allegation that Defendant interfered with her right to take leave because, by terminating her, it failed to restore her to her position following her leave. *See id.* Plaintiff's claim that Defendant "interfered with her right to take FMLA leave by terminating her in response to her actual taking of such leave" is "indistinguishable from" her retaliation claim. *See id.* "Such a theory of 'interference by termination is merely a retaliation theory in disguise.'" *Id.* (quoting *LeClair v. Berkshire Union Free Sch. Dist.*, No. 1:08-CV-01354 (LEK) (RFT), 2010 WL 4366897, at *6 (N.D.N.Y. Oct. 28, 2010)) (denying FMLA interference claim where crux of plaintiff's claim was that defendant terminated her employment as a response to past absences);

*see also Blake*, 655 F. Supp. 3d at 48 (same); *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 203 (S.D.N.Y. 2009) (plaintiff's theory that he was terminated "due to alleged performance problems that resulted from the very use of his FMLA leave" was "no more than an effort to dress [plaintiff's] retaliation claim in (barely) different clothing"). Accordingly, Plaintiff's interference claims under the FMLA and CTFMLA are not viable.

Defendant is therefore entitled to summary judgment as to Counts One and Three of Plaintiff's complaint.

## IV. CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment, ECF No. 34, is GRANTED as to Counts One and Three and DENIED as to Counts Two and Four. Plaintiff's motion to supplement the record, ECF No. 42, is GRANTED.

The Court will convene a status conference with the parties to discuss the setting of a trial date and pretrial deadlines, as well as referral of the case to a U.S. Magistrate Judge for purposes of a settlement conference in advance of trial.

**SO ORDERED** at Hartford, Connecticut, this 30th day of September, 2026.

*/s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE